In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2957

ROBERT WESTEFER, *et al.*,

*Plaintiffs-Appellees,*

*v.*

MICHAEL V. NEAL, *et al.*,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 00-cv-162-GPM—**G. Patrick Murphy**, *Judge.*

ARGUED SEPTEMBER 8, 2011—DECIDED JUNE 6, 2012

Before EASTERBROOK, *Chief Judge*, and BAUER and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. The Closed Maximum Security Unit at Illinois's Tamms Correctional Center is a high-security "supermax" prison. In a previous appeal by several plaintiffs seeking to represent a class of inmates incarcerated at Tamms, we reversed the dismissal of a due-process claim challenging the procedures by

which the Illinois Department of Corrections ("IDOC") assigns inmates to the prison. *Westefer v. Snyder*, 422 F.3d 570, 585-90 (7th Cir. 2005). While the case was awaiting trial on remand, IDOC developed a "Ten-Point Plan for Tamms," significantly revising the procedures for transferring inmates to the facility and including a detailed transfer-review process. Although it had not yet been implemented, IDOC submitted the Plan to the district court at the ensuing bench trial on the due-process claim.

The court then issued a lengthy decision holding that the conditions at Tamms impose an atypical and significant hardship on inmates, giving rise to a due-process liberty interest in avoiding transfer to the prison. The court also held that IDOC's procedures for making transfer decisions are constitutionally deficient. As a remedy, the court entered an injunction incorporating the procedures contained in the Ten-Point Plan, effectively constitutionalizing the specific regulatory regime Illinois was voluntarily implementing. The IDOC defendants appealed, challenging only the terms of the injunction. IDOC argues that the scope and specificity of the injunction exceed what is required to remedy the due-process violation, contrary to the terms of the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(a)(1)(A), and to cautionary language from the Supreme Court about remedial flexibility and deference to prison administrators in this type of prison litigation.

We agree and therefore vacate the injunction. Under the PLRA injunctive relief to remedy unconstitutional

prison conditions must be "narrowly drawn," extend "no further than necessary" to remedy the constitutional violation, and use the "least intrusive means" to correct the violation of the federal right. *Id.* The relevant due-process minimums are those set forth in *Wilkinson v. Austin*, 545 U.S. 209 (2005); *Hewitt v. Helms*, 459 U.S. 460 (1983); and *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1 (1979). These standards preserve significant administrative discretion and flexibility for prison officials. Making IDOC's Ten-Point Plan a constitutional baseline, as the district court did, eliminates the operational discretion and flexibility of Illinois prison administrators, far exceeding what due process requires and violating the mandate of the PLRA.

## I. Background

The Closed Maximum Security Unit at Tamms is the highest security prison in Illinois. Inmates are kept in almost constant isolation because of disruptive behavior and other safety concerns. A group of inmates at Tamms brought this action against various IDOC officials alleging several constitutional claims and seeking to represent a class of inmates who have been or will be transferred to the supermax facility. The class claim challenged the procedures IDOC uses to assign inmates

to Tamms.[1] In the previous appeal, we reversed the dismissal of this claim and remanded with instructions that the district court evaluate the inmates' due-process argument under the Supreme Court's then-recent decision in *Wilkinson*. *Westefer*, 422 F.3d at 589-90. The district court held a bench trial and concluded that the conditions at Tamms "impose an atypical and significant hardship," *Wilkinson*, 545 U.S. at 224, and that Illinois inmates have a liberty interest in avoiding transfer to the prison. The court also held that IDOC's then-extant procedures for making transfer decisions violated the due-process rights of the inmates.   IDOC does not challenge the court's decision on the merits.

Addressing the issue of remedy, the court noted that inmates are assigned to Tamms in one of two statuses: disciplinary segregation or administrative detention. Inmates in disciplinary segregation are those whose record of prison discipline marks them as dangerous even in the disciplinary-segregation system in the State's other prisons. Inmates in administrative detention are classified as too dangerous to be housed in the general population in other prisons because, for example, they are members of prison gangs.  The court held that IDOC's transfer procedures were constitutionally deficient for both groups of inmates.

---

[1]  There were also some individual claims brought by specific inmates. *Westefer v. Snyder,* 422 F.3d 570, 576-85 (7th Cir. 2005). None are relevant here.

Perhaps taking a cue from our earlier decision, IDOC initiated a review of its transfer procedures while the case was pending on remand and at trial submitted the Ten-Point Plan, which substantially revised the process by which inmates would be assigned to Tamms. The Plan had been signed by the governor but not yet written into implementing regulations at the time of trial. The court used the Ten-Point Plan as the framework for its remedial order, incorporating it almost wholesale into a detailed 16-point injunction. Among other things, the injunction specifically requires the following:

1.  The Tamms warden shall appoint a Transfer Review Committee to conduct hearings for each inmate transferred into Tamms;

2.  The hearings before the Transfer Review Committee shall "whenever possible" take place within 10 days of placement (for administrative-detention inmates) and within 30 days (for disciplinary-segregation inmates and also those transferred in investigative status);

3.  All inmates transferred to Tamms before the date the injunction was entered shall have a hearing before the Transfer Review Committee within 180 days of the order—within 90 days for inmates who have been housed at Tamms for more than five years;

4.  Each inmate shall be given written notice of the reasons for his Tamms placement at least 48 hours before his hearing;

5.  Each inmate shall be given an opportunity to refute the reasons specified in the notice, including the right to request that the Transfer Review Committee interview persons with relevant information;

6.  IDOC shall make a digital recording of all hearings before the Transfer Review Committee, which shall be retained by the department;

7.  Following each hearing, the Transfer Review Committee shall prepare a written report containing the inmate's demographic information, the reason for placement, a summary of his disciplinary history, his segregation status, a record of the proceedings, whether he voluntarily renounced association with any prison gang, and the committee's placement recommendation;

8.  The Transfer Review Committee's report shall be transmitted to the warden for review, and the warden shall transmit his approval or disapproval to the Chief of Operations of the IDOC, who shall notify the inmate of the final determination;

9.  Each inmate shall have the right to appeal the decision of the Chief of Operations to IDOC's Chief Legal Counsel; and

10. The Transfer Review Committee shall conduct "routine reviews" and annual rehearings for all inmates transferred to Tamms in administrative-detention status.

IDOC appealed, challenging the injunction's scope and specificity under the PLRA and the Supreme Court's decision in *Wilkinson*.

## II. Discussion

We review the district court's decision granting injunctive relief for abuse of discretion, *Judge v. Quinn*, 624 F.3d 352, 357 (7th Cir. 2010), but a legal error by the court is necessarily an abuse of discretion, *Nat'l Spiritual Assembly of the Bahá'ís of the U.S. of Am. Under Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of the Bahá'ís of the U.S. of Am., Inc.*, 628 F.3d 837, 846 (7th Cir. 2010). The PLRA circumscribes the scope of the court's authority to enter an injunction in the corrections context. Where prison conditions are found to violate federal rights, remedial injunctive relief must be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [use] the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A); *see Lindell v. Frank*, 377 F.3d 655, 660 (7th Cir. 2004) (reversing part of an injunction as overbroad in violation of the PLRA). This section of the PLRA enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: "[P]rison officials have broad administrative and discretionary authority over the institutions they manage." *Hewitt*, 459 U.S. at 467.

As we noted in our earlier decision in this case, in *Wilkinson* the Court considered the supermax-transfer regime used in Ohio and found that the transfer process

in that state—which was the model for Illinois's Ten-Point Plan—"strikes a constitutionally permissible balance" between inmates' due-process rights and prison officials' administrative discretion and safety concerns. 545 U.S. at 230; *see also Westefer*, 422 F.3d at 588-89. In crafting the injunction in this case, however, the district court mistakenly conflated what is constitutionally *adequate* to satisfy due process with what is constitutionally *required*. *Wilkinson* upheld the Ohio supermax-assignment regime, finding the State's procedures sufficient to satisfy the due-process rights of supermax inmates. The Court did *not* hold that the specifics of Ohio's supermax-transfer regime were constitutionally *required* as the due-process floor. In other words, nothing in *Wilkinson* constitutionalized Ohio's program, making it mandatory for every state. Rather, the Court simply held that Ohio inmates transferred to the supermax prison are entitled to some "informal, nonadversary procedures"—as in *Hewitt*, 459 U.S. at 476, and *Greenholtz*, 442 U.S. at 14-16—and that Ohio's transfer procedure satisfied this requirement. *Wilkinson*, 545 U.S. at 211-12.

*Wilkinson* thus stands for a more general proposition: Inmates transferred to a supermax prison are entitled to informal, nonadversarial due process. The district court's injunction goes well beyond this, locking in highly specific formal requirements controlling the timing and content of the notice and hearing that each transferred inmate must receive, and even going so far as to impose a right to appeal. An injunction of this scope and specificity is inconsistent with the "informal, nonadversary" model set forth in *Wilkinson*, *Hewitt*,

and *Greenholtz*, and cannot be reconciled with the PLRA's requirement that injunctions in prison-conditions cases must be narrowly drawn and use the least intrusive means of correcting the violation of the federal right.

A few examples will suffice to explain the overbreadth of this injunction. Informal due process requires "some notice" of the reasons for the inmate's placement, *Hewitt*, 459 U.S. at 476 ("An inmate must merely receive some notice of the charges against him . . . ."), and enough time to "prepare adequately" for the administrative review, *see Greenholtz*, 442 U.S. at 14 n.6; *see also Wolff v. McDonnell*, 418 U.S. 539, 564 (1974) (Notice gives an inmate time "to prepare for the appearance before the Adjustment Committee."). In *Wolff* the Supreme Court held that inmates must receive notice "[a]t least a brief period of time . . . , no less than 24 hours," prior to a hearing to revoke good-conduct credits. 418 U.S. at 564; *see also Jones v. Cross*, 637 F.3d 841, 845 (7th Cir. 2011) (same). Here, the injunction requires that IDOC provide notice of the reasons for an inmate's transfer to Tamms at least 48 hours before the hearing—twice the constitutional minimum for notice ordered by the Supreme Court in *Wolff*. And *Wolff* involved good-conduct credit revocation, which extends the length of an inmate's incarceration, implicating a more significant liberty interest than a placement determination and requiring a greater measure of procedural protection. *See Wilkinson*, 545 U.S. at 228. IDOC's willingness to provide 48-hour notice as a part of its Ten-Point Plan goes beyond the 24-hour notice required in *Wolff* and thus passes constitutional muster. But it contradicts the

PLRA's narrow-tailoring requirement to mandate that specific timeframe in an injunction.

Moreover, the informal review procedure contemplated by *Wilkinson, Hewitt,* and *Greenholtz* need only take place within a "reasonable time" of the inmate's transfer into Tamms. The injunction here establishes 10-day and 30-day time limits (for administrative and disciplinary transferees, respectively) within which a hearing before the Transfer Review Committee must take place, although it does contain some hedging language stating that IDOC shall comply with these deadlines "whenever possible." We have previously held that a wait of 17 days in administrative segregation before receiving a review is not a due-process violation. *Morales v. Newkirk*, No. 95-3943, 1996 WL 253852, at *1 (7th Cir. May 10, 1996). In *Morales* we relied on decisions from other circuits in which a wait of a month or longer before final review was held to be not unreasonable. *See Childs v. Pellegrin*, 822 F.2d 1382, 1388 (6th Cir. 1987) (meaningful review 14 days after segregation began and again two months later when warden issued final decision was not unreasonable delay); *Sourbeer v. Robinson*, 791 F.2d 1094, 1099-1100 (3d Cir. 1986) (35 days in segregation not unreasonable delay). The point here is that due process does not *require* that the placement review take place within some specific number of days. To repeat, the PLRA requires that an injunction use the "least intrusive means necessary to correct the violation of the [f]ederal right." Locking in specific deadlines—even with hedging "whenever possible" language—deprives prison administrators of the operational flexibility to adjust procedures as future

needs dictate and cannot be considered the least intrusive means of correcting the due-process violation.

In addition, the injunction specifies in some detail the content and form of the review process, but the Supreme Court has made it clear that the requirements of informal due process leave substantial discretion and flexibility in the hands of the prison administrators. In *Hewitt,* which involved review procedures in connection with a transfer to administrative segregation, the Court held that an inmate must have

> an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.

*Hewitt*, 459 U.S. at 476. In other words, only a single prison official is needed as the neutral reviewer—not necessarily a committee. Informal due process requires only that the inmate be given an "opportunity to present his views"—not necessarily a full-blown hearing. *Id.; see Wheeler v. Sims*, 951 F.2d 796, 800-01 (7th Cir. 1992). If the prison chooses to hold hearings, inmates do not have a constitutional right to call witnesses or to require prison officials to interview witnesses. *Wilkinson*, 545 U.S. at 228; *Alston v. DeBruyn*, 13 F.3d 1036, 1042 n.2 (7th

Cir. 1994).[2] And the Constitution certainly does not require the prison to digitally record the hearings.

Nor does informal due process necessarily require "a written decision describing the reasons" for an inmate's placement, *Alston*, 13 F.3d at 1042 n.2 (citing *Toussaint v. McCarthy*, 801 F.2d 1080, 1100-01 (9th Cir. 1986)), or mandate an appeal procedure. *Hewitt* requires, in the administrative-segregation context, only a review of the inmate's placement by "the prison official charged with deciding whether to transfer him to administrative segre-

_____

[2] The plaintiffs point to language in *Wolff v. McDonnell* stating that "the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. 539, 566 (1974). We have recently reaffirmed the right of inmates to "an opportunity to call witnesses and present documentary evidence (when consistent with institutional safety) to an impartial decision-maker." *Jones v. Cross*, 637 F.3d 841, 845 (7th Cir. 2011). However, both *Wolff* and *Jones* dealt with a hearing before a good-conduct credit-adjustment committee; good-time credit revocation affects the length of an inmate's incarceration and not merely his placement, and thus triggers greater due-process requirements than those that are called for in this context. *Wilkinson v. Austin*, 545 U.S. 209, 228 (2005); *see Hewitt v. Helms*, 459 U.S. 460, 475 (1983) (circumstances of confinement involve a lesser liberty interest and thus require less process than decisions affecting the length of confinement). *Hewitt* and *Wilkinson* set the correct constitutional standard for "informal, nonadversary" review in the transfer-placement context.

gation," not a right to additional layers of review. 459 U.S. at 476.

*Hewitt* does, however, require a periodic review of the placement determination once it has been definitively made. *Id.* at 477 n.9; *Smith v. Shettle*, 946 F.2d 1250, 1254 (7th Cir. 1991).

> This review will not necessarily require that prison officials permit the submission of any additional evidence or statements. The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner—which will have been ascertained when determining to confine the inmate to administrative segregation—and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for "proof" in any highly structured manner.

*Hewitt*, 459 U.S. at 477 n.9. Thus, as with the initial placement review, the periodic review may also be an "informal and nonadversary" review, *Rowe v. Hurley*, No. 94-2343, 1995 WL 375861, at *3 (7th Cir. June 22, 1995), and its frequency is committed to "the [administrative] discretion of the prison officials," *Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir. 1990) (holding that 120-day interval satisfied due process); *see Clark v. Brewer*, 776 F.2d 226, 234 (8th Cir. 1985); *Smith*, 946 F.2d at 1255 ("To conclude, however, that the due process clause fixes thirty days as the minimum frequency of the required review would be to legislate in the name of the Constitution at an excessive level of detail . . . ."). The periodic review need only be sufficiently frequent that administrative segregation

does not become "a pretext for indefinite confinement of an inmate" at Tamms. *Hewitt,* 459 U.S. at 477 n.9.

In short, the injunction goes well beyond what the Supreme Court has said is constitutionally required. By incorporating a highly specific notice-and-hearing system into the injunction, the district court has in effect established the details of that system as constitutional requirements. This is not the narrow tailoring that the PLRA requires. It is up to IDOC to craft transfer-review procedures that meet the requirements of due process. The court should do no more than to order IDOC officials to do so in general terms and to verify that the plan they submit satisfies the relevant constitutional standards. Accordingly, we VACATE the district court's injunction and REMAND with instructions to enter an injunction consistent with this opinion.